The next case, Pipefitters vs. American Express. Mr. Dobbs? Good morning, Your Honor. May it please the Court. My name is Thomas Dobbs. I'm from the Labaton firm. We represent the appellants here, the lead plaintiff below. I'd like to start my argument with two main points that are somewhat out of chronological order and then circle back in a more chronological fashion, time permitting. The first point is a more straightforward misrepresentation claim dealing with statements by Amex in January 2015 at their conference call, which contained misleading half-truths and did not disclose that there were ongoing negotiations with Costco, nor did it disclose that there had been prior bids put out by Costco to the industry. The second argument, which is the first of our update arguments, deals with the so-called catch-up call and what that reflected. And that led, we submit, to a duty to update with respect to the progress of negotiations and where things stood. And finally, if time permits, I'll circle back to the two initial update claims dealing with statements in September and October of 2014 that should have been updated after Costco put the entire contract out to bid. Now, dealing with the January 21 call, which was the fourth quarter conference call, we're dealing with January 21, 2015. The best way to look at this is that this is in a context of a question and answer. And it just to- What's false in that statement? I'm sorry, Your Honor? What is false in that statement? What is false in that statement, and if we want to look at it, it's at A44 in paragraph 86 of the complaint at length. Why don't you stand in front of the mic so we can hear you? I'm sorry, Your Honor. It's at A44. And the analyst is questioning, when might we hear about the Costco US deal? And the answer by the CFO, Mr. Campbell, is Costco is a very important and long-term partner. True? Yes, that is true. No question about it. We think we've been great partners and created a lot of value, and that's true, too. And they say, I would point out to you that I don't think we said anything about ongoing discussions we're having with Costco. Then what's false? So he says, I don't think we've said anything about ongoing discussions. What's untrue about that? That is true, as far as it goes. Now we get to the problem. Why does he have to say any more? He has to say, because now he gets out of the safe harbor of the no comment in the next sentence I'm about ready to address. And that's where it begins to get unraveled. He says, obviously, with very important partners, we're always working every day to evolve the relationship, to make it better, and frankly, to make sure it's working for both parties. You can presume we're doing that with Costco as we're doing it with all our partners. You know what? That's just a big dodge. It's a dodge of a question about what the deal is with regard to the negotiations. It's not an indication that they're negotiating. It's the fact that they work hard with their partners. We allege that what that means is, yes, they do work hard with their partners. We're not disputing the actual factual truth of that. The impression being created, however, is that this is more or less routine servicing of large, important customers. It's not a representation of negotiations of the renewal of a contract. That's correct. It's not, because it's not, because they Why does one have to update it when the negotiations do begin? This is not an update claim, Your Honor. Let's be clear. It's a claim that says that that statement that we just talked about and just discussed is a half-truth. And it's a half-truth because they started to talk about what was going on with Costco, how they were treating Costco, how they were servicing Costco. And they made it look routine. They created the impression it was routine, and it was anything else but routine. To be truthful, they could say that, which we all admit is true. But then they had to say, and in addition, we are also in serious negotiations with respect to the agreement, which is the predict. That's a separate issue from the fact that they have ongoing daily relations with the company. Well, once you bring up a subject, you have to talk. If I say, I'm a corporation president, and I say, well, I have a great relationship with Chin Enterprises. And they're a great customer, and we've done business for a long period of time. And I really appreciate the business that we do with them, and we work very hard to maintain a good relationship with them. And at the same time, I don't disclose that Chin Enterprises and I are about to engage in a negotiation, renegotiate the contract. I violated 10b-5. That's not this case, but the answer is you might violate it. Well, I think it is. So answer my question if it were. Let me try to convince you that. Well, answer the question first, and then you can tell me why it's not. Well, the problem with Your Honor's hypothetical is that the first part of it is probably puffery. And this predicate sentence goes beyond that. It says, why isn't this puffery? Obviously, with very important partners who are always working every day to evolve the relationships. Why isn't that puffery? You can presume we are doing that. We're presuming that we are doing servicing, and frankly to me, not saying anything. Well, they are saying things. Number one, they are saying, look, the whole market knows that this contract is in peril. So the whole context of this thing, which is set forward by the analyst. The whole market knows that it's in peril? Yes. The whole market knows that this contract is up and is potentially at risk, and it's a huge contract. Yes. So this is not totally in the abstract. And these people aren't just getting up and making statements about how things are going. This is in a particular context. In that context, we submit and we pass the plausibility threshold because of what the analyst says. The analyst sets the stage for this. And that's where the district court went awry. And that's very easy to go awry because you have to take the context. And in these calls, the analyst set the context. And the analysts are concerned, if not obsessed, with the timing and what's going on with this contract. And they're saying, well, we're doing the routine good old stuff that we always do. And they don't go on to say that they're in serious negotiations. Now, what's so bad about that? What's so bad about that is that the rule is clear. The judicial gloss is that there is a safe harbor on transactions. What he says is, what the rule is, is that by saying something, he has to then open the door for necessity to update it. I don't understand how this opens the door to the fact that he has to update the fact that on a separate issue  That he's got a great relationship with a client and he was working on a relationship with a client. Because you and I both agree that this doesn't have anything to do with negotiations. It doesn't have anything to do with the negotiation other than being misdirective, yes. That's called politics and business all the time. That's fine. Politicians make a living doing that. That's true. And we all do. And hopefully, we do it well. But the point is that we're talking about two rules. And perhaps I didn't explain it. We have two rules in play here. One is the rule Your Honor just articulated, which is if you speak on a subject, you have to speak fully and truthfully. That's rule two. Rule one is if you're talking about potential transactions, you have to say no comment. That's the rule. That's the rule that this court and other courts have set down. That is a safe harbor. And once you get outside that safe harbor, you are traveling at your peril. And they walked out of the safe harbor. And they walked out of the safe harbor for a clear motive because they were in a fix. They were in a fix because they had lost Canada. People were concerned whether they would lose the United States. They wanted to keep the stock from tanking. And so what they said repeatedly was, in the abstract, statements of either historical fact, or you can say it's puffery. But they were saying, we're different. We have a 15-year relationship with these people. And that's why this has nothing to do with Canada. So hang on. Don't panic. And that's what was going on. And this is just another version of this. You have two minutes for about it. We'll hear from the other side. Thank you very good. Thank you. Thank you. Good morning, Your Honor. Stephen Asher from Jenner and Block for the defendants. May it please the court. This is an unusual case. The plaintiffs are challenging two statements that are undeniably true and admittedly true. And they're trying to fly spec them and bring a case based on implications and connotations that are not fairly read from the statements themselves. And they're also trying to do another thing, which is read those statements in a vacuum and ignore all of the risk disclosures that American Express made over the years, which explicitly disclosed the risk that this contract would not be renewed when it expired. And those risk disclosures were actually focused and intensified during the period at issue. And if you look at these statements and read them fairly, and also read them in context, they were not misleading. And there was no intent to defraud. Now, since Mr. Dubbs spent all of his time on what had been the second claim, I'll go straight to that. As Your Honors recognized in your questioning, the plain words of Mr. Campbell's statement disprove the allegations. The plain words were absolutely true. And rather than repeat some of the points that I know that Your Honors already made in your questions, I do want to just focus on one additional thing that didn't come up. In Mr. Campbell's statements, in addition to saying that he wasn't going to comment, because I don't think we've said anything about this, and in addition to saying some very vague comments, which indicated he was trying to avoid talking about this, he also made another very important reference. He said, if and when we have any news, as we did with Delta, which we chose to renew early, we would certainly tell you. Now, Delta was another co-brand relationship that was coming up for expiration, and as part of its strategy to renew that contract, Delta, excuse me, American Express initiated early negotiations to renew it, and those negotiations were successful. And so by referring to that, it makes it even more clear that this is an absolutely accurate statement that would have been understood by these analysts to mean, right now, we are talking to Costco the way we talk any other time, and don't worry, if we reach an agreement to renew, or we don't reach an agreement to renew, we'll tell you, just like we did with Delta. So you can't take that Delta piece out of the statement. It really helps to understand just how complete and how accurate this statement was. The SEC had required them to make a statement on their 10K MDS to the Delta issue. That's correct, and because of the turmoil in the airline industry at a certain point. Co-branding relationships, at least in the context of Amex, are a big chunk of their business, and Delta and Costco actually are the two biggest, I guess, aren't they? That's correct, Your Honor, and so at a certain point in time, several years earlier, Amex had disclosed the Delta relationship. Importantly, in 2015, American Express, excuse me, in 2014, American Express revised its risk disclosures to also disclose the Costco relationship, and that's how much transparency American Express made about this risk of termination, and that's precisely the way the risk disclosures were improved just before and during the class period to provide full information to the market. Doesn't that then put a brighter light on the need for American Express to respond then and be transparent in the context of any negotiations that are going on or difficulties that are going on? I think American Express did have a duty to tell the market when the negotiations had failed, and that's exactly what American Express did. In February. Your opponent seems to indicate that that was too late, that it should have been earlier. Yes, and I think the essence of Plaintiff's case is that American Express had some sort of obligation to update the market about the progress of negotiations almost in real time, and the securities laws absolutely do not impose that type of an obligation. It would interfere with companies' ability to do business. There are multiple cases, starting with BASIC, that talk about the importance of giving companies the ability to do business, and you do not have to make a negotiation. I mean, just imagine the rule that they're trying to set down. Oh, the negotiations went badly today. Let's tell the market the negotiations went badly. Two days later, we made a breakthrough. Let's tell the market again. That's not the law, and that would be a horrible, horrible rule from a policy perspective. The other point I'd like to make, Your Honors, is Mr. Dubs described the law in this area as being once you go beyond no comment, all bets are off, and you've committed a securities law violation. That's not the law. There are two cases in this area. There's the Bucksbaum case, and there's the MCI case. Those are not cases where the defendants simply went beyond no comment. Those are cases where the defendants made affirmatively false denials of ongoing merger negotiations. So the Bucksbaum case was a case where Deutsche Bank was in the process of negotiating a merger or takeover of Banker's Trust. The CEO was asked about that, and he said, definitively, there was no talk of a takeover when, in fact, there was. That was a definitive false statement. That is way beyond just not saying no comment. That is an affirmative false statement. Similarly, in the MCI case, MCI had registered an internet domain name of a company that it was negotiating with. It was asked, why did you register that domain name? Is it because you're gonna take that company over? And the corporate officer falsely said, that's not our intent. Registering that domain name is not indicative of our intent to acquire that company. Those are both false denial cases. I'll also touch briefly, since I have a little more time, on the duty to update claim, if I may. Once again, absolutely true statements. The contracts that American Express had with United States and Canada were separate. They were completely separate. And the facts here show that those contracts were separate. After the deal with Canada was terminated, and that announcement was made in September of 2014, American Express negotiated separately with Costco US for four more months. And during that time period, American Express genuinely and reasonably believed that even though its much smaller relationship with Costco had not been renewed, that this much larger relationship, which had gone on for many years, and which would have been very expensive, and was very expensive for Costco US to replace, they believed that they would successfully renegotiate. So it was not at all inevitable from the time that Costco Canada non-renewed, that Costco US would also non-renewed. And that's really the essence of their case. They're saying, you really knew once you lost Canada, it was inevitable that you would lose US. That wasn't true. And in fact, an interesting point, your honors, Costco US and Costco Canada actually entered into contracts with different credit card companies. So it was not inevitable that Costco US was going to do exactly what Costco Canada did. And in fact, they didn't do exactly what Costco Canada did. Here again, the plaintiffs also ignore the law. The only cases that recognize a duty to update involve predictions, guarantees of future performance. The key second circuit case on that is Illinois State Board versus Authenticate. And that was a case where the company said, it believes it has reached an agreement in principle, and it was, quote, very confident about amending a key contract with the US Postal Service. And the company subsequently learned that it would not be amended and didn't disclose that. That was really a definitive, predictive statement. You cannot compare anything that American Express said about these contracts being separate to the statements that were made in the Authenticate case. If your honors have no further questions, I'll rest. Thank you. Thank you. We'll hear the rebuttal. Thank you, your honor. First, on page 59 of the papers of my colleague on the other side, they admit that Mr. Campbell, the CFO, knew at the time of the January statement that active negotiations were going on. So their actual knowledge of that is not an issue. Now, what we have been talking about before is not undercut by my colleague's discussion of the cases where people flat out lied. They were outside the safe harbor, and they lied, and they got what was coming to them. If you were in the middle of a transaction, you say, and you're asked, how's it going? You say, no comment. If you say something else, you are at your peril. Here's something else was said. It has a future component, a future-looking, forward-looking component to it because these people had messaged from day one that this contract would go through or have a very good chance of going through because of the longstanding 15-year relationship which made it different than Canada. That was the strategy. And when those statements which were made, which you can put up on a sampler, and individually they're all true, that means nothing because the context of the trading and the context of the whole thing make them part of a mosaic which for purposes of alleging particularity we submit is sufficient. Now, as to the risk disclosures, if you look at the risk disclosures, they're very general, and they talk about the risk that this thing would not be renewed. Everybody agrees if there was a risk, it wouldn't be renewed. It says so much, it says nothing. That's the bottom line on the risk disclosures. And indeed, even if they were tighter, if you allege actual knowledge under the PSLRA, you can pierce the risk disclosures. So anytime, I appreciate what you're saying because of the response, particularly on the Canada thing, after the Canada contract is canceled, he says, well, U.S. is separate and we've had a longstanding relationship in the U.S. and we work on a daily basis with them, they're important to us, et cetera, et cetera, et cetera. But so anytime that there's a longstanding relationship with a client and this client is important to the publicly traded company and there's negotiations that might be going on and there's a question about are these negotiations going on, if the CFO says this is an important company to us and we've done business for a long period of time, that then imposes an obligation to disclose that the negotiations are going on. If the question is asked, how are negotiations going? And the answer is, we are servicing them like we serve all the other big clients that we love, period. Then they've gone outside the no comment zone and they have to be fully truthful and they have to say where it's admitted clearly that they knew that negotiations were going on. That, if you go beyond that or you cut back on that, that is the rule as it exists. People don't like it. That would have to be, that's the rule as you understand it. Well, I think. You have to endorse that. Well. Well, your view is you think. We think, let's put it this way more neutrally, we think the cases in this circuit are pretty clear about the no comment rule. I'm not saying you're wrong. I'm just trying to figure out how the rule is articulated on a reverse, that's all. On reversal, it should be that we satisfied the pleading requirements of particularity. They have their argument, we have ours, but we pled sufficient particularity that there was a half truth with respect to the failure to disclose the negotiations in this context. In this context where an analyst has specifically addressed the CFO and says talk about the negotiations. If he said talk about the weather, it's a different case. Thank you. Thank you. Wait, wait. I have one more. Oh, I'm sorry, your honor. You began by saying that the defendants admitted something on page 59 of something. I'm sorry, I wasn't clear. I apologize. On page 59 of their responsive papers in their brief to this case. The brief on the field? Yes, your honor. It only goes to page 56. If I have the wrong, bear with me one moment. You mean 54, I think? I think it's 50. The defendant knew that there were ongoing negotiations? He knew that there were ongoing negotiations and then there's a clause at the end that tries to qualify it. I apologize, your honor. My notes weren't clear and I messed up. Can't read your own handwriting. Thank you. Thank you.  Thank you, your honor.